512

CERCY et al. v. TRADERS & GENERAL INS. CO.

No. 3953.

Court of Civil Appeals of Texas. El Paso.

May 30, 1940.

Rehearing Denied June 20, 1940.

Underwood, Johnson, Dooley & Wilson, of Amarillo, H. A. C. Brummett, of Dickens, and L. D. Ratliff, Jr., of Spur (R. A. Wilson, of Amarillo, of counsel), for appellants.

Lightfoot, Robertson, Gano & Johnston, of Fort Worth, and Henry Russell, of Pecos, for appellee.

PRICE, Chief Justice.

This is a proceeding under the Workmen's Compensation Act, Vernon's Ann. Civ.St. art. 8306 et seq., filed by the legal beneficiaries of C. S. Cercy, deceased, before the Industrial Accident Board, seeking to recover compensation for the death of said Cercy. The decision of the Board was in favor of the insurance carrier, and suit was filed in due time in the District Court of Winkler County to set aside the action of the Board and recover compensation. Trial in the District Court was to the court and resulted in a judgment in favor of the insurance carrier. Appeal was duly perfected from this judgment, and the case is here for review.

On motion of appellants the court filed findings of fact and conclusions of law. These findings reflect fully and fairly the nature and result of the suit, and will be here set out in full, save that parts having no material bearing on the issues involved on appeal will be omitted.

"Findings of Fact

"1. C. S. Cercy was shot to death on the 26th day of June, 1938. He was killed by O. G. Hardman at a point on the public highway leading from Kermit, in Winkler County, Texas, to Jal, New Mexico, which point was about two miles north of the town of Kermit.

* * *

"3. I find that the deceased at the time of his death was employed by two companies, the Uscan Drilling Company and the R. Olsen Oil Company, such companies both being incorporated and having a common president, and common

superintendent, maintaining a single office with many identical employees. Prior to the 1st day of May, 1938, the said C. S. Cercy had been regularly working for the W-K Royalty Company, a separate and distinct concern with no relationship to either the Uscan Drilling Company or the R. Olsen Oil Company; but had been doing some additional work for the R. Olsen Oil Company in connection with the maintenance of one of its leases, but this connection between Cercy and the R. Olsen Oil Company had not been by virtue of any employment by Blount, the superintendent of said Uscan Drilling Company and R. Olsen Oil Company, but had been under correspondence directly between Cercy and the Oklahoma City office of the R. Olsen Oil Company. About May 1st, 1938, however, C. E. Blount, the said superintendent, employed Cercy to work for each of said companies, upon terms that the Uscan Drilling Company should pay to Cercy a monthly salary of $135.00 per month and the R. Olsen Oil Company should pay to Cercy a monthly salary of $115.00 per month, the terms of such employments for said two companies being duly reported to the Oklahoma City office of the two companies and by them tacitly, if not expressly, approved. At the time of such employment, the Uscan Drilling Company was actively engaged in the drilling of one or more wells for oil production in Winkler County, Texas, and similarly was either engaged or had in contemplation that it would become engaged in the active drilling of one or more wells immediately to the north of Winkler County, Texas, but across the line at Jal, New Mexico. At the same time, the R. Olsen Oil Company was the owner of four separate and distinct producing properties, also in Winkler County, Texas, three of these properties being located slightly to the north and west of the town of Kermit, and the fourth of them being located to the south and east of the town of Kermit, each of these properties having, in addition to the producing well, storage tanks and such other equipment as was necessary to the producing and running of the said wells. Cercy's employment was oral; Superintendent Blount, at the time of employing Cercy to work for each of said companies, imposing on Cercy these duties: that, on behalf of the Uscan Drilling Company, he should be an assistant su-

perintendent under Blount, doing, in connection with Blount, whatever work was necessary in connection with the drilling of the wells; and that, on behalf of the R. Olsen Oil Company, he should look after the management and producing of its four properties.

"4. The Uscan Drilling Company furnished the deceased a Ford pickup truck, which Cercy was supposed to use to perform its work. The deceased, in addition, owned his personal car, which he had on some prior occasions used when his wife accompanied him to the wells. The wife of the deceased, at the time in question, was on a visit to her parents in Louisiana, and during her absence the deceased lived with W. O. Nash, whose house was located about four miles from Kermit between Kermit and Jal, New Mexico. The Nash home was located on the road upon which the deceased Cercy was later killed by Hardman. The point of this fatal difficulty was between the Nash home and the town of Kermit. This road likewise was the road used by the deceased to go to the well near Jal, New Mexico, whether he started from the Nash home or the town of Kermit. On Saturday, June 25, 1938, the Uscan Drilling Company had two wells in process of drilling, one of those wells being in Winkler County. The well at Jal, New Mexico, was approaching the point of setting casing. In the morning of Saturday, June 25, 1938, Cercy left the house and place of business of Nash, located as aforesaid by the side of the road four miles to the north of the town of Kermit, and went to the well at Jal, spending some time there and returning about noon. In the afternoon, Cercy and Nash devoted themselves to their own pursuits, attending a rodeo in the town of Kermit which had no relation to either of his employments. Following the rodeo in the afternoon, Cercy again returned to the Uscan well which was drilling at Jal, spending some additional time there, and getting back to the Nash residence and place of business about 9:00 o'clock in the evening. At this time Cercy reported by telephone to his superintendent, Blount, in the town of Kermit, the progress of the well; and, upon inquiry by Blount as to when the well would be ready for the setting of casing, made reply in substance that, in his judgment, it could not be ready until after 4:00 or 5:00 o'clock the following morning; and

514

in this connection Blount instructed Cercy to pick up some tools and return to the Jal well after 4:00 or 5:00 o'clock in the morning, which would require Cercy to go about three miles west of the Nash home, pick up the tools in the pickup, retrace his steps to the Jal road and then go north to the well. The following morning would have been Sunday, but the drilling of the well had reached the point that delay would have been attended by both hazard and extra expense, not contemplated by the drilling contractor, so that, viewing all of the circumstances, the setting of the casing the following day would have been a work of necessity within the meaning of the compensation law. For approximately an hour Cercy remained with Mr. and Mrs. Nash at their home; but then expressed himself to the effect that since he had to be back at the well so early the following morning, he would not go to bed but would again visit the rodeo in the town of Kermit instead, which, accompanied by W. O. Nash, he then did. He did not at this time refer to any necessity of visiting either of the producing Olsen wells; but, having reached the town of Kermit, and after spending some time at the rodeo, he expressed himself as desiring to go to the Olsen well which lay south and east of the town of Kermit, and, in company with Nash, he did in his own private automobile traverse the paved public highway south and east from the town of Kermit to the producing Olsen well, and there spent approximately two minutes, following which, and traversing the same paved road back northward to the town of Kermit, he returned in his automobile to the town of Kermit, and there again took up his personal pursuits at a dance hall in the town of Kermit. Cercy's trip to the Olsen well was in the performance of his duties with the R. Olsen Oil Company.

"5. I further find that the deceased Cercy and W. O. Nash went to Kermit to spend the night visiting the rodeo and local dance halls until time for deceased to return to Jal, New Mexico. The deceased had no duties to perform in the town of Kermit in connection with the work of the Uscan Drilling Company or the R. Olsen Oil Company, and this trip was solely for the pleasure of deceased during the hours intervening before he returned to work.

"6. I find that about 3:00 o'clock in the morning on the 26th day of June, 1938, the deceased and Nash had already spent some time dancing at a dance hall near the town of Kermit, and at such time determined to return home, where the deceased was to leave Nash and change cars and return to his work in Jal, New Mexico. W. O. Nash went to sleep.

"7. The Tascosa Club, where Cercy had been spending these hours which had no relation to his duties for either employer, was located on the main street of Kermit, approximately four or five blocks to the west of the signal light where Cercy would have made his turn north had he returned directly from the Olsen well to the Nash residence. In his own car after leaving the Tascosa Club he traversed this four or five blocks back to the signal light and then turned north, at which point he was placed back on the same stretch of road on which he would have been initially if, returning from the Olsen well without interruption, he had gone back to the Nash residence and place of business. Traversing this direct road north he had about reached the city limits, approximately a mile to the north of the signal light, when another car bumped into his car from behind. Cercy, expressing himself as wondering who it was, brought his car to a stop on the highway. The driver of the other car, subsequently identified as one Hardman, walked up and commenced saying in substance to Cercy that his, Cercy's car had come too close to the other car at some point back towards, or in, the town of Kermit. In this conversation, Hardman was complaining only of the manner in which Cercy had operated his car. Cercy made reply in courteous tones, trying, to use the witness Nash's language, to smooth the matter over. Nash, who was sitting on the right side of the Cercy car, got out and started backwards toward the other car to see what had happened. Hardman had in the meantime gone back so that he was closer to his own car, which was approximately thirty feet to the rear of the Cercy car, with Nash some distance to the rear of the Cercy car. At this time, Cercy, then getting out of his own car, suddenly called to Nash that Hardman had a gun. Nash grappled with Hardman for the gun and was knocked

down by Hardman, who then shot Cercy. Cercy never recovered consciousness, dying in the hospital at Kermit the next morning from his bullet wounds sustained on this occasion. The place where the two cars stopped and the shooting occurred was in Winkler County, Texas, as was also the hospital in Kermit where Cercy later died on that same morning, and the place on the road where the two cars stopped and the shooting occurred was on the same direct paved road which Cercy would have traversed, had he, on his return from the Olsen well earlier in the evening, driven directly to the Nash residence and place of business instead of stopping in the town of Kermit, to divert himself until it was time to return to the Uscan well at Jal.

"8. There was no evidence as to whether the supposed passing of the two cars had been between the Tascosa Club and the signal light, or whether it had been on that portion of the north highway between the town of Kermit and the Nash residence; nor was there any testimony that any such thing had actually occurred save the testimony that Hardman was saying to Cercy that it had occurred. There was no evidence of any ill will, animosity or differences between Hardman and Cercy save as to the matter of driving of which Hardman was complaining. In such complaint neither Hardman nor Cercy referred to the property or work of either company.

\* \* \*

"10. I find that the defendant, Traders & General Insurance Company, prior to the time of the death of deceased, had issued to the Uscan Drilling Company a policy of Workmen's Compensation Insurance covering its work near Jal and in Winkler County, Texas, and including the work of the deceased while engaged thereon. I find that the defendant, Traders & General Insurance Company, issued a separate and distinct policy to the R. Olsen Oil Company, which policy covered the work that deceased performed when working for the R. Olsen Oil Company immediately preceding and at the time of his death. These policies were outstanding and in full force when deceased was killed.

"11. I further find that it was necessary for the deceased to use the public highway in going from the Nash home to his work in Jal, New Mexico, for the

Uscan Drilling Company, and to use the public highway in going to his work from the home of Nash to the other wells being drilled by the Uscan Drilling Company, but to reach either of said wells from the Nash home it was not necessary to pass through the town of Kermit, or over the part of the highway where he was killed.

"12. I further find that the deceased used the public highway in going from his home to the leases maintained by the Olsen Oil Company, and on such trip he could use one or two roads, one of which ran through the town of Kermit and over the road on which he was killed, but neither of which roads ran by the dance hall where deceased was dancing just prior to his return to the Nash home."

"Conclusions of Law

"1. I find as a matter of law that at the time of the death of C. S. Cercy there was outstanding and in force a policy of workmen's compensation insurance covering C. S. Cercy while working for the Uscan Drilling Company, which policy of compensation insurance was issued by the defendant, Traders & General Insurance Company.

"2. I find that at the time of the death of C. S. Cercy there was outstanding a policy of workmen's compensation insurance issued under the laws of the State of Texas to the R. Olsen Oil Company, which included the said C. S. Cercy while working for the R. Olsen Oil Company.

"3. I find that C. S. Cercy at the time of his death was employed by both the R. Olsen Oil Company and Uscan Drilling Company, working at different times for each of said companies.

"4. I find that the compensation rate in this case is $20.00 per week.

"5. I further find that when the deceased reached home at nine o'clock P. M. the day of his death, and left his employer's car and went to Kermit in his own car to see a rodeo, he was engaged on a personal mission of his own, and was not engaged in the performance of any duty or work or the furtherance of the affairs or business for either R. Olsen Oil Company or Uscan Drilling Company.

"6. I find that at about 11:00 o'clock P.M. of said June 25, 1938, when the deceased, together with Nash, went to the

lease of the R. Olsen Oil Company that such trip was made in the course of his employment for the R. Olsen Oil Company, but when the deceased returned to the town of Kermit, and again took up the pursuit of his personal pleasure, he abandoned said employment and from the time of said return to Kermit was not engaged in or about the furtherance of the affairs or business of either of such employers. ·

"7. I find that at the time deceased was killed he was on a public highway in Winkler County, Texas, returning home from said personal trip to Kermit, but had not yet reached home, from which point he intended to go to work for the Uscan Drilling Company, and I therefore find that at the time deceased was killed he was not in the course of his employment for either the R. Olsen Oil Company · or Uscan Drilling Company, and was not engaged in or about the furtherance of the business of such companies, but was returning from a trip of his own in his own car, and was not entitled to the protection of the Workmen's Compensation Act of Texas on account of said policy issued to either the Uscan Drilling Company or the R. Olsen Oil Company, and plaintiffs cannot recover herein.

"8. I find that said deceased was killed by· O. G. Hardman, who pursued him from the town of Kermit to a point on the Jal highway north of Kermit for the purpose of having an altercation with him on account of the previous differences over the passing of the automobiles, and that such fatal shooting was not directed against C. S. Cercy as an employee of either the Uscan Drilling Company or R. Olsen Oil Company because of his employment, but was the act of O. G. Hardman, who killed the deceased because of reasons personal to him and to deceased, and that for such reason the plaintiffs herein are not entitled to recover.

"9. I find the deceased was killed as a result of a shooting which did not grow out of or constitute a risk incidental to his employment, and it is my opinion the plaintiffs cannot recover herein."

It will be observed that it was found that at the time of his death deceased, first, was not working in the course of his employment; second, that the deceased was slain by Hardman because of rea-

sons personal to deceased and to Hardman, and the act was not directed against Cercy as an employee or because of his employment.

As we interpret the finding that deceased was not in the course of his employment when slain, it is based upon two theories: First, that, even though, at the time he met his death, deceased was engaged in performing acts for his employers contemplated by the employment, the act by which he was slain was on account of reasons personal to him and not as an employee or on account of his employment; second, that in truth and in ·fact he was performing no acts in the course of his employment for his employers at the time he was slain.

Art. 8309, R.S.1925, as applicable here, provides: "The term 'injury sustained in the course of employment,' as used in this law, shall not include: * * * An injury caused by an act of a third person intended to injure the employé because of reasons personal to him and not directed against him as an employé, or because of his employment." This provision renders an injury inflicted under the enumerated condition non-compensable, even though at the time of the injury the employee be engaged in the work of his employer.

Compensation under the law is conditioned upon the employee's injury being sustained while he is "engaged in or about the furtherance of the affairs or business of his employer." Art. 8309. First, then, let us consider the issue as to whether or not deceased, at the time he was killed, was engaged in or about the furtherance of the affairs or business of his employers, or either of them. In this consideration the exception made by the statute above quoted .from will be ignored. ·

It is well established that where the employment, as an incident to its prosecution, requires the traveling along the streets or highways, that while so engaged the employee is acting in the course of his employment; further, that injuries caused by the risk of such travel are compensable. Also, that the employee is protected while returning without material deviation to his place of abode, or to the place of performing other work for his employer.

With the exceptions made by the law, the one involved here having been quot-

ed above, the protection is broad and comprehensive, and covers all risks incident to such travel. Federal Underwriters Exchange v. Lehers, 132 Tex. 140, 120 S.W.2d 791, and authorities there cited.

On the other hand, even though the prosecution of the employer's business requires travel, it is only while traveling in the futherance of his employer's business that the policy of insurance protects. When driving on the streets in the business of his employer the policy covers; but when driving for other purposes not incident to the employment, same does not cover.

In the instant case, if at the time of the shooting, deceased was acting in the course or scope of his employment for either of his employers, it is not material to determine for which one he was working. However, a consideration of his acts on the night preceding and the morning of his death in relation to his two employers may aid in the determination of the ultimate issue of whether or not at the time of his death he was acting in the course of his employment for either.

Under the findings, amply sustained by the evidence, in leaving the Nash residence after nine o'clock P.M. on the evening of the 25th of June, and going to Kermit to attend the festivities attendant on the rodeo held there, he was not acting for either of his employers. So as to the time spent in Kermit preceding the trip to the Olsen well. In making this trip and returning to Kermit a fair construction of the findings is that he was acting for the Olsen Oil Company. It was not reasonably contemplated that any duties should be performed for the Uscan Company until he started in its truck from the Nash residence to collect and deliver the casing tools. He did not go to Kermit on business of the Uscan Company, and it follows, in returning therefrom he was not on its business. The trip to the Olsen well southerly from Kermit was in the interest of the Olsen Company. The return to Kermit was incidental to the trip, and during these times he was engaged in the business of the Olsen Company. On his return to Kermit from this trip he went to the Tascosa Club and remained there pursuing his own pleasure until about three A. M. of the morning of June 26th. When he left, concededly to go to the Nash residence, obtain the truck, collect the tools, and go to the drilling operations of the Uscan Company near Jal, the road on which he was traveling just before he was killed was the same road he would have traveled had he returned immediately from his trip to the Olsen well to the Nash residence. On leaving the Tascosa Club, however, it was necessary to get on this road to travel about five blocks.

It is clear that his stopping at the Tascosa Club was a deviation from his employment with the Olsen Company. After inspecting the well and returning therefrom he resumed the pursuit of his original intention when he left the Nash home to go to Kermit. It does not appear whether or not at the time he left the Nash residence for Kermit it was his intention to visit the Olsen well. However, be that as it may, we do not believe it is controlling here.

In our opinion when he returned from the Olsen well and elected to remain at Kermit until the time to depart for the Nash home in order to begin his duty for the Uscan Company, he had abandoned his employment with the Olsen Company. His purpose in returning to the Nash home was to get the truck and proceed with the work of the Uscan Company. Southern Casualty Co. v. Ehlers, Tex.Civ.App., 14 S.W.2d 111.

The question we have to answer here is, whether, as a matter of law, at the time the deceased met his death, he was acting in the course of his employment for either of his employers. If the question be answered in the affirmative, then, the finding of the trial court is incorrect. On the other hand, if the question be answered in the negative, the finding and the judgment are correct.

The trip to the Olsen well was not the occasion of his return from Kermit. When he returned to Kermit all duties for the time being owed to the Olsen Company had been discharged. In our opinion when he left Kermit at three A.M. to go to the Nash home, it was not a return to the employment of the Olsen Company. As stated, this employment, for the moment, was at an end, and was never resumed. Southern Casualty Co. v. Ehlers, supra.

If we are incorrect in the holding that the deceased was not acting in the course of his employment, as a matter of law, at the time he met his death, in any event, there was an issue of fact presented, which was decided against appellants.

Under the record there is no question but that Hardman designedly shot the deceased. The evidence is not as clear and satisfactory as to all the details of the shooting as it might be. Gathered from the testimony of Nash, deceased's companion at the time of the homicide, they had reached the road leading to Jal and Nash's residence, and proceeded for something like a mile along that road. A car bumped into the rear of deceased's car. Deceased stopped his car and the other car stopped in about thirty feet of the rear of deceased's car. Up to this time Nash had been asleep. The occupant of the car came to deceased's car and engaged the deceased in conversation. It was asserted by Hardman that at some time or some point in passing, deceased's car had passed too near his car. According to the finding deceased spoke mildly to Hardman. Hardman then returned toward his car. Nash got out of deceased's car, went back toward Hardman's car to see if it had been in any way damaged. Deceased was still in his own car when he called out to Nash that Hardman had a gun. Nash grappled with Hardman, or attempted to. The deceased got out of his car and started toward Hardman and Nash. Hardman then shot him. According to the testimony, as claimed by Hardman, the colloquy between deceased and Hardman had its inception in the deceased driving his car in relation to that of Hardman. When, how, or where this initial incident, if it did take place, took place, the evidence does not disclose. There may have been a basis in fact for it, or there may not. The initial incident may have taken place on the Jal road, may have taken place between the Tascosa Club and the Jal road. If the incident occurred at a time when deceased was not acting in the course of his employment, clearly the acts of Hardman were directed personally against the deceased and not against him as an employee or on account of his employment.

█ Further, while it was an understandable, natural, gallant and courageous act, if the circumstances be as narrated by Nash, for deceased to go to the aid of his companion, it was not necessarily an action connected with or in furtherance of his employers' business.

The case of Erwin v. Texas Employers Ins. Ass'n, 63 S.W.2d 1076, writ refused, in this respect bears some analogy to this case. There, the plaintiff, in his capacity as a driver on the milk route, was on the streets in the early hours of the morning. Two negroes drove up in a car and addressed plaintiff in a manner which aggrieved him, but which had no relation to the employment of plaintiff. Plaintiff approached the car with a milk bottle in his hand, when one of the occupants wantonly and brutally shot him down. It was there held, as a matter of law, that the compensation policy did not cover. The act was directed against the plaintiff for reasons personal to him or personal to the slayer, and was not one of the risks incident to his employment.

The car in which deceased was driving was his personal property, the presence of Nash therein by no stretch of imagination had anything to do with the performance of the duty of deceased's employment.

Under the evidence it is, at best, an issuable question of fact whether the act of Hardman had its inception in some prior conduct on the part of deceased when acting in the course of his employment. If there was ill feeling on the part of Hardman toward deceased prior to the immediate occasion of the killing, it does not satisfactorily appear what the reason of it was. Ostensibly, it was some prior incident on the roads. This may or may not have been the fact. Hardman was armed at the time. When or why he armed himself does not appear.

We do not mean to hold, and do not hold, that an employee traveling on the roads in his employers' business accidentally or undesignedly killed is not covered by the workmen's compensation policy. We think he is. Further, even though he be designedly killed, if his death was brought about by some act connected with his employment, or by an act directed against him as an employee or on account of his employment, the policy would cover. But here, at least, it does not appear beyond an issuable fact that his employment, if it be granted he was working at his employment just before his death, had anything to do with his death.

The case has been fairly and ably tried, and judgment entered called for by the evidence.

The case is affirmed.